FILED _____ ENTERED
_____ LODGED _____ RECEIVED

AUG 0 4 2025     RE

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTTLE

| | |
|---|---|
| DENNIS L. CHINN, an individual, ) | **25-CV-01456** RAJ |
| And ) | |
| CHINN INVESTMENTS, LLC, ) | Case No. _____ |
| a Washington Limited Liability Company, ) | |
| Plaintiff, ) | **COMPLAINT** |
| V. ) | **JURY DEMAND** |
| ) | |
| CITY OF SEATTLE ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiffs CHINN INVESTMENTS, LLC, and Dennis L. Chinn, the controlling member of the LLC, bring this action against Defendant City of Seattle (the " City") seeking damages caused by actions taken by prior and present elected officials, employees, and representatives of the City in their mis-guided efforts to solve the homelessness crisis in the City over the past decade. Plaintiffs allege that City policies were intended to, and had the effect of,

COMPLAINT AND JURY DEMAND                1                 Dennis L. Chinn
9001 NE 37th Place, Bellevue, WA 98004
(206) 459-5326

concentrating the homeless population in the ethnic minority areas of the City, specifically in the area officially designated as Little Saigon. Plaintiffs allege that the City's policies put into place in order to accomplish this goal violated Plaintiffs' equal protection rights under the 14th Amendment of the U.S. Constitution, Title VII of the 1964 Civil Rights act, as amended, and constitute a Taking of Plaintiffs' property without just compensation under the 5th Amendment of the U.S. Constitution.

## PROLOGUE

Being homeless is not a crime. Most people who find themselves in that sad situation do not want to be there, and deserve a helping hand from their neighbors, their friends, and their government. The homeless should not be demonized. Those who need and want help should receive it. A large homeless population does, however, provide an easy target for exploitation, drug addiction, crime, and lawlessness that is the antithesis of a healthy community. When a City's policies encourage large congregations of homeless individuals in areas where these other issues are already present, the intersections of these issues with homelessness are a recipe for disaster. In simplistic terms, boredom, hopelessness, and exploitation lead to drug addiction, addiction fuels crime, and crime leads to lawlessness and a total breakdown of social norms. When a City's policies adopt a myopic focus on what it believes to be the common characteristic, homelessness, and allows that to excuse drug addiction, crime, anti-social behavior, and lawlessness, chaos results. Add to that a City's decision to selectively <u>not enforce</u> its own local criminal ordinances, and what results is what one sees daily in the Little Saigon neighborhood of Seattle; shuttered storefronts, vacant buildings, open drug use and sales, large congregations of addicts and people with mental illness, vagrancy, widespread theft, a thriving black market in stolen goods, EBT fraud, and violent crime.

## INTRODUCTION : FAMILY LEGACY AND THE HISTORY OF THE LAND AT THE CENTER OF THIS LAWSUIT

1.    Plaintiff, Dennis L. Chinn, and his extended family have owned a parcel of land that stretches from 10th avenue to 12th avenue, on the north side of Jackson Street in the Chinatown International District (CID) in Seattle, Washington. The area where the property is located is now officially designated the <u>Little Saigon</u> neighborhood of the City of Seattle. The parcel was acquired in a series of purchases beginning in the late 1940s by Wilce Shiomi and Mitsuko Saiki Shiomi, the father and mother of Sandra Shiomi Chinn, whom Plaintiff Dennis L. Chinn married in 1968. In about 1989 the parcel was transferred to Dennis and Sandra Chinn who developed it into the Asian Plaza Shopping Center.

COMPLAINT AND JURY DEMAND            2            Dennis L. Chinn
9001 NE 37th Place, Bellevue, WA 98004
(206) 459-5326

Sandra unexpectedly passed away in 2011 and the parcel passed to Dennis and their children, Nathan and Brian Chinn. In about 2017, the parcel was transferred into CHINN INVESTMENTS, LLC, where ownership remains to the present.

2.      Plaintiff's extended family has been deeply involved in the Chinatown International District (CID) area for over 75 years in many capacities. Plaintiff's grandfather emigrated from China, married a woman from Seattle,  and his father (Andrew) and 3 siblings were all born in Seattle.  Plaintiff's mother (Mary) was born in British Columbia, Canada, and moved to Seattle upon marrying Andrew, and later became a naturalized U.S. citizen. Both Andrew and Mary were very active in the Seattle Chinese community, Andrew serving as president of the Chinn Woo Yuen family association, the Kong Yick Investment Association, the Chinese Art Club, and other organizations.

3.      Sandra Shiomi Chinn's grandparents, all emigrated from Japan, and her parents, Wilce and Mitsuko were born in, and grew up in, Seattle and Bellevue, respectively.  In about 1942, Wilce, Mitsuko, and their siblings were incarcerated at Tule Lake Internment Camp under Executive Order 9066. After being released from the camp, Wilce was drafted into the U.S. military and went through basic training in preparation for being sent to the European theatre as a medic. The War ended before he was deployed and Will and Mitsi returned to Seattle with their newborn infant daughter, Sandra, in tow.  Wilce and Mitsuko opened a radio repair shop on Yesler Avenue in the CID and eventually were able to start purchasing the property at 12th and Jackson. Finally, sometime in or about the 1950s, Wilce and Mitsuko were able to purchase Connors Furniture and Appliance Store at 12th and Jackson from Frank Connors. They left the name as it was because they felt that customers would balk at shopping there if they knew that the business was owned by Americans of Japanese descent. They continued to operate that business and were also very active in community organizations like the Chamber of Commerce and the Nisei Vets Association, until they retired in 1989.

4.      Plaintiff's purpose in giving this detailed personal history of his extended family is to emphasize that the current lawsuit is not simply about what has happened to a random parcel of land in Chinatown. Plaintiff's family has had strong cultural and economic ties to this community and the parcel of land that is the subject of this lawsuit for more than 75 years and 5 generations. In Asian culture the family land is the element that ties generations of family together. Plaintiff is outraged that his family's multi-generational investment in the economy and culture of this community has been destroyed by myopic local politicians who do not seem to care about this community or its people, and who seem to view it simply as a dumping ground for problems that they do not want to deal with elsewhere.

**Asian Plaza;  the center of the Seattle vietnamese community**

5.        As heirs to this land, Plaintiff's family has tried to be worthy stewards of its legacy. In 1989 Dennis and Sandra converted the property into a shopping center called Asian Plaza and rented small spaces to local ethnic businesses at rental terms low enough to ensure that the businesses could survive. The Plaza rapidly became the business and cultural center of the Vietnamese community in Seattle.

6.        Among the notable earliest tenants were Viet Wah Supermarket,  A Little Bit of Saigon restaurant, New Saigon Deli, Kim Hoan Jewelry, Nam Phuong Bookstore, Asian Counseling and Referral Service, Thanh Vi Restaurant, Sichuanese Cuisine, Ocean Pacific Travel, Lynn Hair Salon, Saigon Bistro, and Seattle Meat and Barbecue.  More recent tenants include Tamarind Tree Restaurant, Vietnam House Restaurant, Integrity Law, Minh Tam's Market, Helping Link, and a few other local businesses that served the community. Any person who lived in Seattle for any length of time and had any interest in food and/or other things Asian, will certainly recognize many of the tenants that used to occupy space in the Asian Plaza, and the vibrant cultural scene that used to run from Friday to Sunday every week. Visiting at any time was interesting, exciting, educating, and above all perfectly safe. That all changed in a heartbeat.

**Homelessness, drug addiction, and mis-guided policies**

7.        The dominant social issues of the last 10 years are the opioid/fentanyl  crisis and homelessness. Both of these issues are present to some extent in most, if not all U.S. cities. The responses, however, differ, greatly between different cities. Seattle's approach, like that of San Francisco, seems to have been focused on the word "homeless," so the obvious "solution" is simply to provide them housing. The problem is massive. The recent Point-in-Time count estimates that at least 16,000 people were experiencing homelessness on a given day in King County in 2024, up 23% from 2022. There are many questions about the methodology and accuracy of such counts, but without a doubt, the true number is massive. "King County reports largest number of homeless people ever," Seattle Times, May 15, 2024.

8.        Seemingly ignored is the underlying need to find out exactly who these people are at any given point in time since the composition likely changes over time. Different segments of the homeless population require different strategies and solutions so not understanding who they are and the specific issues they face is a fatal knowledge gap. The naïve view is that these are just people who were living paycheck to paycheck when they were laid off from their job, or had a medical emergency, or some other event beyond their control that upset their life situation. They could not make the mortgage payment or fell behind in the rent and ended up on the street. But what about individuals who have a medical condition or disability that

COMPLAINT AND JURY DEMAND                4                 Dennis L. Chinn
                                                        9001 NE 37th Place, Bellevue, WA 98004
                                                        (206) 459-5326

presents them from holding a job? What about those whose longstanding drug addictions have the same effect? What about those who simply choose to live on the street because it gives them a sense of freedom? What about those who prey on people who have no place to go and choose to live on the street among their victims?  What about those who come to Seattle because Seattle provides a higher level of homeless services than other areas? In each of these situations there is a "homeless" person, but obviously the appropriate solutions are different. Yet those differences seem not to have deterred the City from focusing on "housing the unhoused" since that by definition eliminates the problem for the idealized "homeless" person. In this view, large encampments on public property are a good thing and should be permitted.

9.    This focus has led to a very skewed policy environment in which the direct and indirect effects of those policies on other groups are simply not part of the equation. For example, consider the decision to allow homeless encampments in public parks. Is that beneficial to the homeless? Yes. Is life better for them in that it provides a welcome respite from having to worry about finding a different place to sleep every night? Yes. If we allow them to use drugs in the parks, that also makes their lives better since they don't have to go elsewhere to shoot up. But when parents complain that they can't let their kids use the parks for fear they might accidentally get poked by a discarded needle, or that the bike path is blocked by tents, or that they don't feel safe, they are told that their kids should play in their own yards or elsewhere because the homeless need a safe place to sleep and that is a higher priority.

10.    Plaintiff's concern is the flip side of the City's single-minded focus on providing for the needs of the homeless. What are the impacts of these policies on the other 99% percent of the population that is not homeless?  More specifically, City of Seattle policies in the name of homelessness have trampled the legal rights of  Little Saigon residents and property owners for years. Moreover, from the ground this trampling of their rights has the feel of being purposeful. Little Saigon is being consciously and intentionally sacrificed by Seattle policymakers in order to keep other areas of the City free from such problems. The cost is high, both to Little Saigon and the greater Seattle area as a whole. To lose the excitement and vibrancy of the ethnic communities in our City is devastating. When this loss comes without the sought after benefit of reducing the homelessness problem, it  is tragic.

11.    This myopic policy focus has also given rise to the ascendancy of " homeless advocates" in policymaking , which has in turn fostered a public discourse environment in which anyone who dares question the direction or efficacy of Seattle's homeless policies is characterized as "unfeeling" or worse.  Plaintiff recalls a situation a few years ago in which some City council members criticized private citizens who dared put up fences on their properties to try to keep homeless squatters and the accompanying problems out. Those

COMPLAINT AND JURY DEMAND                    5                    Dennis L. Chinn
                                                            9001 NE 37th Place, Bellevue, WA 98004
                                                                      (206) 459-5326

members proposed an ordinance banning fences as "hostile architecture" that fortunately was not adopted. Plaintiff alleges that this limiting of public discourse through badgering actual critics and silencing potential critics of these policies made it difficult to turn the ship before it hit the rocks, as it has.

**Predictable consequences; the destruction of a business community**

12.    If you venture down to 12th and Jackson today, you will encounter a very bleak scene. At the bus stop adjacent to Plaintiff's property at any given time, day or night, you will likely see a dozen or more drugged out people,  some actively using with their tin-foiled stashes and bic lighters.  Across Jackson Street and around the corner on 12th there will be 50 people doing the same thing, again at any time of day or night.  The problem is not that these people are "homeless", in fact some may not be. The problem is that they are committing crimes, using drugs in public, defecating on the street, and creating a hostile environment that keeps others away because they fear for their safety. When the Seattle Police Department will not enforce the City's own ordinances, and these individuals know it, lawlessness reigns. The idealized homeless individual who is just temporarily down on his luck is not in this group or part of this problem. How did we get to the point that the 12th and Jackson area is a wasteland? Widespread lawlessness is permitted because some of the perpetrators are homeless. How is this okay?  How is it that other areas of the city are nowhere near as bad?

13.    The substantial collection of people living on the street in and around the 12th and Jackson area has spilled over onto Plaintiff's property and has resulted in a substantial presence on Plaintiff's property, as well as on other adjacent private properties. At any given time, night or day, numerous homeless individuals can be found on Plaintiff's property.  For purposes of this lawsuit, Plaintiff alleges that Seattle homelessness policies have resulted in both a partial physical taking of Plaintiff's property, and a regulatory taking, under current federal case law regarding the Takings clause of the 5th Amendment of the U.S. Constitution.

14.    Over the course of the last few years, all of Plaintiff's  tenants in the main building were forced to close up shop because their customer base was destroyed. Customers coming to eat at a restaurant would have their cars broken into. Plaintiff and his sons have personally called 911 to report a car being broken into while it was happening. It was quite disheartening to have the dispatcher say they would not dispatch any officer, and that the owner of the car should call his or her insurance agent.  Many of Plaintiff's tenants have told Plaintiff that they do not even bother to call 911 anymore no matter what has happened because no help is ever dispatched. This makes it particularly galling when the lack of reported crime in the area is cited by local politicians as "evidence" that there is little crime in the area.

COMPLAINT AND JURY DEMAND                 6                 Dennis L. Chinn
                                                            9001 NE 37th Place, Bellevue, WA 98004
                                                            (206) 459-5326

15.    The final, and most consequential, tenant to give up was Plaintiff's anchor tenant, Viet Wah Supermarket. They were among the first tenants to lease space in Asian plaza in 1989. They leased 15,000 square feet and remained the primary tenant for 35 years until they were forced to close their doors for good on September 30, 2022. Over the years when economic times were difficult Plaintiff made numerous rent adjustments so they could survive, and at the time of their final closing their actual annual rent was substantially less than the lease rate. Viet Wah was an institution in Little Saigon and their closing in 2022 can be directly attributed to the failure of the City of Seattle to enforce its existing anti-theft laws and prosecute repeat thieves.

16.    When Viet Wah Supermarket closed, Plaintiff lost its last major tenant and the last remaining source of rental income. Plaintiff alleges that this loss was a direct result of failed policies of the City of Seattle that infringed on his rights as a citizen, community member, and a property owner.

17.    So, at that point Plaintiff's situation was this: He could not find new tenants because the area had become a wasteland of drug use and sales, homeless encampments, fecal waste, needles and drug paraphernalia everywhere, with zombie-like addicted individuals hanging out at bus-stops adjacent to the property. Who would even consider renting space to open up a business with no customers, and chaos all around, with little police protection? In large part this has happened because the City of Seattle will not enforce its own ordinances in Little Saigon. Apparently, citizens in Little Saigon do not merit the protections afforded to residents in other areas of the City.

**The vacant building problem: blame the owners**

18.    Once the Little Saigon business community had been destroyed and most of Asian Plaza had become a vacant building, things just continued to get worse. The City of Seattle leaders of course did not recognize their own culpability in causing the situation and the game now became blame the building owners.

19.    The City now comes down on business and property owners as if the fact that their buildings are vacant is their own fault. Apparently Little Saigon property owners turn tenants away because they much prefer having a vacant building so that they can have the enjoyment of fighting to keep squatters from occupying and desecrating their buildings? This is ludicrous. Plaintiff's building was placed in the Seattle vacant building monitoring program. Under that program an inspector stopped by every month for a few minutes to see if the building was secure and sent Plaintiff a monthly bill for about $700 to pay for the inspection. On one particular occasion, Plaintiff witnessed the inspection as it was taking place. The inspector drove into the parking lot, stopped, did not get out of the car, sat for 10 minutes or so, and

COMPLAINT AND JURY DEMAND              7              Dennis L. Chinn
                                                      9001 NE 37th Place, Bellevue, WA 98004
                                                      (206) 459-5326

then drove off.  A few days after that Plaintiff received a letter informing him of the inspection and an invoice for the $700 inspection fee. The total monthly inspection fees paid by Plaintiff for these mandatory inspections was $4,400.

20.     During the period that Plaintiff's vacant building was in the vacant building inspection program Plaintiff was beset by other problems caused by thieves and drug users, some of whom but not all, may have been homeless. On a daily basis squatters would set up tents around the building and deposit trash, used needles, shopping carts,  and usually human waste because their toilet was just outside their tent, and a large amount of trash. Plaintiff had to hire janitorial service to clean up the mess daily. From the large numbers of used needles that were left, it appears that a substantial part of this group was using. When Plaintiff or his sons saw individuals living on their property, they would ask them politely to move elsewhere onto public property where they would not be bothered. Generally, they left, but occasionally there were uncomfortable shouting matches and angry words.

21.     At least once or twice per week someone would break into the building looking for shelter or to steal copper wiring and pipes, apparently to sell as salvage. During this period every inch of copper wire and pipe was stripped out of Plaintiff's building. The individual(s) involved had construction skills. They disabled the main high-voltage meter that fed the building, smashed the subsidiary meters feeding the individual tenant spaces and stripped every inch of  copper wire out of the building. Once the main meter was disabled Plaintiff had no choice but to turn off all power to the building. Once they started cutting out copper water pipes Plaintiff then had to shut off all water to the building.

22.     During this period Plaintiff's son Brian had to serve as the designated security team for the building.  There was no one to hire who would take the risk involved in doing what Brian did. Whenever Brian would get a call from a tenant or the janitor saying that an intruder had cut a lock off a door, or smashed a window, cut a hole in a fence, or pulled down a steel gate to gain entry, Brian would go down with tools and materials to secure the building once again. Through his weekly efforts almost all of the inspection letters we received noted that the building was secure, but with violations (usually the violation was accumulated trash left by the homeless squatters from a day or two before).

**Predictable consequences : the building was burned down**

23.     The risk in Seattle that squatters will break into a vacant building and, either accidentally, or on purpose, burn the building down is substantial and well-known.  According to a Komo 4 news report on June 14, 2024,  Seattle recorded 77 fires in vacant buildings in 2021, 91 in 2022, 130 in 2023, and 35 in the first half of 2024.  These are vacant unoccupied buildings.  In all likelihood that is precisely what happened to Plaintiff's building. On June 10, 2024, the

COMPLAINT AND JURY DEMAND                8           Dennis L. Chinn
                                                      9001 NE 37th Place, Bellevue, WA 98004
                                                      (206) 459-5326

building was burned to the ground. Because the building was vacant and sending firefighters into the burning building was unsafe, there was no way to determine the precise cause of the fire. Gas and electricity to the building had previously been shut off, so it would seem that any source of combustion must have been man-made. In any case, the Seattle fire marshal's determination was that the fire was likely caused by homeless squatters who broke into the building. At least now Plaintiff's property was removed from the vacant building list, so he didn't have to pay for more superficial useless inspections.

**The only remaining option has failed**

24.    Plaintiff was facing a no-win situation and had no choice but to try to market the property for sale and did so with CBRE. In December of 2021 he entered into a contract with Mill Creek Residential Trust (MCRT) to sell them the property for development. After two years of planning and development work by MCRT at substantial cost, their equity partner apparently came to his senses and realized that investing in the Little Saigon area currently made little economic sense. The buyer's representative also reported that when potential construction lenders came to visit the site, they were shocked at what they saw and questioned why would they invest in such a run-down area. Plaintiff's sale deal fell through at the 11th hour. There are no other prospects in sight as the commercial real estate market in the Little Saigon area is at a standstill. Other buildings near 12th and Jackson that have been for sale are also just sitting.  Others are in foreclosure.  "Seattle's affordable housing industry is in crisis, City faces tough choices," Seattle Times, June 17, 2025.

25 .  Yet commercial real estate in other neighborhoods is selling and new construction appears to be booming. What accounts for the marked difference? Who's fault is it?  At one level the answer is obvious. In Little Saigon, open drug use and sale, the use of the public street as a toilet, widespread theft, frequent car prowls, EBT fraud, and creating a public nuisance in the area are de facto permitted by the City. The police will rarely be dispatched to 911 calls and, if and when they are, they rarely arrest anyone for violating theft or vagrancy or drug ordinances because they know the City prosecutor will just release them. If the police actually stop and tell people openly using drugs to move on, they simply return 5 minutes after the police leave.  The 11 random stabbings that occurred near 12TH and Jackson on November 7 and 8, 2024, brought home the high physical risk of being in the area. Little Saigon is a wasteland of drug use, homelessness, and squalor, and high personal risk. Why do other neighborhoods appear to be in much better shape, largely unaffected by these issues? To what extent are the City of Seattle decisionmakers culpable? These are some of the critical question this lawsuit seeks to answer.

**Litigation: the last resort**

COMPLAINT AND JURY DEMAND            9            Dennis L. Chinn
9001 NE 37th Place, Bellevue, WA 98004
(206) 459-5326

26.    Plaintiff is out of options. He can't occupy the property since the building is gone, he can't rent the property since there are no takers, he can't afford to pay the outrageous property taxes on a property that are levied on a property that generates zero income, and he can't even sell the property and give up his family's multi-generational legacy.  Plaintiff has no recourse but to turn to the courts to seek some relief.

## JURISDICTION AND VENUE

27.    This case arises directly under  the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution , 42 U.S.C. s 1983, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. s 2000e, et seq, and the Takings Clause of the Fifth Amendment of the U.S. Constitution.

28.    This Court has jurisdiction over the complaint under 28 U.S.C. ss 1331 and 1343.

29.    This Court has authority to issue a declaratory judgment, attorneys' fees, and other necessary and proper relief under 28 U.S.C. ss 2201 and 2202.

30.    Venue is proper in this Court under 28 U.S.C. ss 1391 as the acts or omissions giving rise to the claims of this suit occurred in the City of Seattle.

## FACTS

31.    Plaintiff's position in this lawsuit is that degradation of the 12th and Jackson area, the unwanted conversion of his thriving Asian Plaza shopping center into a vacant building, the fire that destroyed the building, and the loss of the sale were all in large part the result of the misinformed City of Seattle homelessness policies that have created an environment in which it is extremely difficult for any business to survive, let alone thrive.

32.    The issue of homelessness  is complicated and widespread, and in that Seattle is not unique.  What is unique is Seattle's policy responses,  responses that this lawsuit aims to show were in violation of Seattle's own ordinances, the U.S. constitution, federal laws against discrimination, and the basic principle that one of the most important functions of government is to protect all its citizens equally from harm.

33.    On November 2, 2015, the Seattle Times, reported that then mayor Ed Murray and King County Executive Dow Constantine declared a "state of emergency" over homelessness. On Monday April 3, 2023, Komo News reported that "The City of Seattle spent nearly $1 billion on homelessness in more than a decade, and the number of unsheltered people continues to

COMPLAINT AND JURY DEMAND              10              Dennis L. Chinn
                                                       9001 NE 37th Place, Bellevue, WA 98004
                                                       (206) 459-5326

rise." Seattle's homeless policies over the past decade seem to meet the popular definition of insanity, "doing the same thing over and over again and expecting a different result."

34.    The apparent guiding myth underlying much of Seattle's approach to homelessness is that this group is a more or less homogeneous group of individuals who are just down on their luck and linked by a common lack of a permanent place to live.  If we can just somehow find them a place to live, every other crisis issue will be resolved. Those who need mental health care will get it, rehab centers will be full of addicts eager to get clean, theft will stop because they will no longer need to support their habits. All will be well in Kansas.

35.    While it may be unfair to caricature this approach, this seems to be precisely what former King County Executive Constantine recently pitched on June 11, 2024, in his State of the County address:

> "One widely held belief is that behavioral health issues, like untreated mental health or substance use disorders, are root causes of the homelessness crisis that we see all around us. This is wrong. University of Washington researcher Gregg Colburn has shown that the cause of the homelessness phenomenon is not individual challenges, but housing market failure."

This conclusion is absurd on many levels, not the least of which is that that Mr. Constantine's conclusion of a causal relationship does not follow from the study he cites as definitive. Correlation is not causality. But because it is the mistaken view of the policymakers who are "leading" this effort it is more tragic than laughable.  Since the current Seattle Mayor Harrell seems closely aligned to Mr. Constantine through the King County Regional Homelessness Authority, given this focus at the top, Plaintiff has serious doubts that the concerns raised herein will be addressed anytime soon.

36.    The policy approach of focusing on the one characteristic this group of people have in common is overly simplistic, mistaken and counterproductive. Solving the homelessness issue of any single person requires understanding that person's situation and tailoring his or her interface with available services in order to treat the binding deficiencies. But the path to the ultimate goal cannot be, as the current and continuing City policy approach seems to be, to just give the person whatever they say they want. At the risk of sounding paternalistic, what a homeless person wants may not be what is in his or her best interests.

37.    It is not as if the different problems among the homeless population are impossible or even difficult  to  identify. Suppose a homeless person is caught in the act of stealing goods from a local market. Is he a thief or a homeless person? What if he says he was hungry? Should his theft simply be ignored as a crime of "need"?  What if he was stealing to support his drug habit? In the effort to "decriminalize" drug use, should he simply be regarded as

COMPLAINT AND JURY DEMAND              11              Dennis L. Chinn
                                                      9001 NE 37th Place, Bellevue, WA 98004
                                                      (206) 459-5326

having a disease and be allowed to steal with impunity to support his habit? From Plaintiff's view, this seems to be exactly what is happening.

38.    There must at times be some element of "societal coercion." It is difficult to see how coercion can be justified if the sole focus is on what a drug addicted person wants, homeless or not. Yet "societal coercion" is easily justified by recognizing that there are consequences on others from the addict's refusal to accept treatment. Recognizing that what may appear to be actions only harmful to oneself often have widespread negative impacts on others would be a helpful first step. This is the primary point of this lawsuit.

39.    Allowing homeless addicts to create an unsafe, unsanitary and uncomfortable environment on the street in front of a local neighborhood restaurant is clearly not a benign activity. It is what has caused the loss of the local business community in the Little Saigon neighborhood. The widespread negative impacts of allowing that behavior on others should be recognized and weighed against the "rights of the addict" to use drugs whenever and wherever he or she wants. Efforts to "decriminalize" public drug use in the City seem to be effort to ignore the consequences on others. The notion seems to be that if those addicted aren't made to feel as if they are doing something illegal (which they are), then they might be more willing to voluntarily accept going to rehab as a way out of the horrible cycle they are in. In reality, removing all social stigma of using illegal drugs seems to have encouraged use, and made it less likely for users to accept treatment.

40.    The apparent Seattle policy of making drug rehab treatment voluntary or optional to those openly using in public seems based on a mistaken attempt to respect the "rights" of an addict to use in Plaintiff's presence, in locations that he has an equal right to be. Making acceptance of drug treatment services voluntary on the part of the recipient renders those services useless. The position taken in this lawsuit is that this apparent "right of an addicted user" to refuse treatment is in direct conflict with my right as a citizen to have public areas I use free of open drug use by persons who choose not to take treatment. Further, why focus on the "right" of the addict to use in public? Why not focus on his "right" to be free of his addiction? A decision to force him into rehab against his wishes might well be the most favorable to him, whether his drug-clouded mind knows it or not. It certainly would be path favored by the rest of society.

41.    What about those who choose to steal to support their drug habit? That is also allowed in Seattle with impunity. This has partial roots in the "defund the police" movement that had a number of vocal advocates within the Seattle City council. The feared reduction in police resources led to the complete neglect of enforcement of property crimes because they were "only about money and nobody gets hurt." This costly myth has contributed to the loss of the Little Saigon business community.

COMPLAINT AND JURY DEMAND              12

42.    From a law enforcement perspective, it would seem that a person openly using drugs on a public street is committing a crime, just as a person who takes goods from a local market without paying for them is also committing a crime. Why should it matter whether that person committing those crimes is homeless? It shouldn't, but in Seattle today it does.  Plaintiff alleges that treating being homeless as a "get out of jail free" card is little more than enabling criminal behavior. It ultimately results in lawlessness, wreaks havoc on the rest of society, and does not help the homeless individual.

**Frustration with the City's criminal justice system**

43.    Plaintiff is highly frustrated with the lack of enforcement of City ordinances in and about his property in Little Saigon. The Seattle City Attorney's office website says;

> **The Criminal Division works to :**
>
> Ensure respect for and compliance with criminal municipal ordinances by holding offenders accountable through fair and effective prosecution and enforcement.
>
> Advocate on behalf of crime victims to ensure the preservation of their rights to personal safety, restitution, and participation in the criminal justice process.
>
> . . . . .
>
> **A personal statement from City Attorney Ann Davidson:**
>
> As your City Attorney, I am committed to recentering victims' voices in Seattle's public safety conversation. Residents, small business owners, and community members all deserve elected officials who are going to act with urgency. I remain focused on real-time accountability in our criminal justice system. I am committed to making Seattle a safer place for everyone in our community.

44.    Recent  criminal Incidents in Little Saigon seem to be in serious conflict with these official statements.  How does choosing to not enforce ordinances prohibiting theft, open drug use, and vagrancy at all in Little Saigon "Ensure respect for and compliance with criminal municipal ordinances by holding offenders accountable through fair and effective prosecution and enforcement."?  For any who think he is exaggerating how bad the situation in Little Saigon really is, Plaintiff suggests looking at current media reports. In recent months there have been a large number of news articles detailing the extent of crime, drug use, and homelessness specifically in Little Saigon. Here is a partial list:   "Seattle and King County have deserted Little Saigon," Seattle Times, Dec. 3, 2021. "Seattle's Little Saigon, beset by crime, looks for a way forward," Seattle Times, March 20, 2024. "Little Saigon needs relief, now," Seattle Times, Sept. 30, 2024. "Empathy for people on the street should extend to Little Saigon

residents," <u>Seattle Times</u>, Oct. 7, 2024. "Seattle reduced disorder downtown. But it didn't go far," <u>Seattle Times</u>, Dec. 9, 2024. "Man stabbed in random attack in Seattle's Little Saigon, police say," <u>Seattle Times</u>, Dec. 30, 2024. "'You wake up in a panic': Little Saigon business owners endure,'" <u>Seattle Times</u>, Jan. 6, 2025.

45.     For several years before finally closing their doors for good, Viet Wah Supermarket was experiencing heavy losses due to rampant shoplifting. In the last several months of their existence they reported experiencing multiple shoplifting events every day. In fact, the traditional idea of shoplifting where someone takes an item, conceals it , and sneaks out without paying doesn't really fit here. The thieves would brazenly walk into the store, sometimes even taking a grocery cart, load up whatever items they wanted and simply walk out of the store.  When store employees tried to stop them, fights were a regular occurrence, and the store managers feared for the safety of their employees because there was no immediate way of telling whether a particular thief was armed, belligerent, high or contagious. Calls to 911 did not result in a police response unless there was an imminent risk of bodily harm. Theft itself did not merit any police response.  Absent any police presence, the only way for Viet Wah managers to avoid exposing their employees to risk of personal harm was to acquiesce and let the thieves operate with complete impunity, which they did.  The monetary cost of such frequent theft was staggering, and eventually Viet Wah was forced to close its doors for good. "Citing crime, COVID, and costs, Seattle's Viet-Wah supermarket shutters," <u>Seattle Times</u>, Oct. 1, 2022.

46.     Plaintiff has recently experienced many criminal incidents on his property that illustrate the City's lack of meaningful enforcement of  its own ordinances in Little Saigon.

     **Incident 1**: On October 31, 2023, Plaintiff's son Brian noticed that the building had been broken into at the location of the old Saigon Bistro restaurant.  After yelling to see if anybody was in the building, and getting no response, Brian cautiously entered the building. He turned a corner into a utility closet and found himself face to face with a big guy carrying a bag of tools. Brian was afraid he also had weapons, but a bag of tools was bad enough. Brian shined his flashlight in the guy's face and told him he had to get out. Brian felt very threatened as he was in an enclosed space with a very angry guy. Brian quickly backed out of the building, moved away, and put the dumpster between the homeless guy and him. The intruder angrily stormed out of the building, got on a bike, and rode off.

47.     Brian called 911 to report the break-in and talked to the operator.  As is usual, the request was registered on a rolling list according to priority and when an officer is free and if your call is on top,  they will respond. If you ask when you could expect a response the dispatcher can't give you an answer. The problem is that property crimes are low priority so that your request for help may never rise to the top of the list so there may never be a police

COMPLAINT AND JURY DEMAND              14

response. More importantly, whether or not police will arrive seems to be a random event so one cannot depend on a call to 911 bringing help.

48.    Realizing that he was unlikely to get any response, let alone a quick one, Brian walked to the front of the building and saw a police cruiser parked across the street. He walked over and explained the situation to the officer, who said he was actively on another case so he could not come and take a report. The officer, however, did agree to meet Brian the following morning to take a police report and give him a case number so he could upload his videos and other evidence. The next morning the officer followed through, met Brian, and filed a report. In the two and one-half years since that report was filed Brian has had no contact, follow-up, or any indication that anything will ever be done about the report.

49.    **Incident 2:**  In approximately July of 2024 Plaintiff and his son Brian were on-site inspecting the damage to the fencing they had installed around the fire site when a homeless individual who appeared to be severely impaired started yelling at them and started to approach. Plaintiff and his son moved away from him further down the sidewalk for their own safety and asked him what he wanted. He then started to jump up and down erratically acting like a chimp and making gorilla noises and then dropped down to the ground and rolled around. Plaintiff and his son were concerned for his safety and their own, so they looked around for help.  They knew from past personal experience that if they called 911 and said there was a homeless guy acting erratically no officer would be dispatched. By chance a police car was passing on Jackson Street, so they flagged it down and explained the situation and their concern to the two police officers and the mental health professional who was riding along with them. The officers noted his erratic behavior and told him that he was on private property and that he had to leave. He ran across Jackson Street narrowly avoiding getting hit by a car.  As Plaintiff and his son talked to the officers the same homeless individual crossed back over to their side of Jackson and re-entered Plaintiff's property. After that the officers drove up to the other driveway and put the homeless guy in the back of the patrol car and apparently arrested him for trespassing. Plaintiff and his son then focused their attention on trying to secure the fencing around the fire site.

50.    Plaintiff's takeaway from the way this event turned out was, first, that they got law enforcement help in dealing with this guy purely by chance. If the patrol car that they flagged down had not happened to be driving by they would have been on their own property facing a big guy who was threatening and believed he was a gorilla.  To their surprise and comfort, this particular unit was part of the mental health unit that was supposed to provide mental health guidance to the officers when they contacted an individual who needed such attention. Yet here was a guy who seemed completed incapacitated, either by mental illness or heavy drug use, or both.  And yet even with two police officers and a mental health professional present

to deal with the situation, the sole reason they took him into custody was that he was trespassing on private property.

51.    Plaintiff later found out that at the time of the incident,  this individual's arrest record showed 8 arrests, the disposition of each of which was CHARGED AWAITING TRIAL, all in the first half of 2024. The charges include  DUI, Hit and Run, No Valid Driver's License, Assault (3), Criminal Trespass, and Theft.  This individual had some serious problems and was in need of serious help, but the question for present purposes is :  Why is he roaming around free in Little Saigon doing whatever he wanted and committing more crimes, while law enforcement knew him, his history and the risks he posed to other members of the Little Saigon neighborhood, and had arrested and charged him 8 times in the prior 6 months?  From a different perspective, it seems clear why the officers were not anxious to bring him in again when the result would only be that another item was added to his arrest and release record. The problem is not at the SPD officer level.

52.    **Incident 3:**  On October 29, 2024, Plaintiff's son Brian noticed a silver Honda civic parked in the middle of the parking lot of the property. Inside were two women both passed out. Brian knocked on the window several times and both women were non-responsive. He could see tinfoil in the lap of the driver with drug residue on it as well as a lighter in her hand.

53.    Brian didn't want them to wake up and drive off endangering themselves and others, so he called the police. This time officers were dispatched. They knocked continuously on the car windows until the two women eventually woke up. The officers evaluated the women and decided that the driver was too intoxicated to drive but the passenger wasn't as bad, so they had the women switch seats and let them drive off.  Brian watched in disbelief because minutes before both women were completely non-responsive and obviously drugged out. The officer told Brian that he was an expert at recognizing impairment and she seemed OK to drive. That was not particularly reassuring.

54.    These are only three incidents of many that occurred on the property that Plaintiff and his son could recount, and the same is true of most other small business and property owners in Little Saigon who have been living with this for many years.  From Plaintiff's perspective this represents a serious lack of commitment to making Seattle a safer place for everyone in our community.  The City Attorney's hollow public promises are not reassuring.

55.    Seattle City's attorney's office is governed by enforcement policies set by the City Council and the mayor's office. Plaintiff has no way of knowing at this point who or which body has been responsible for the failures of the City to enforce its ordinances with respect to open drug use, theft, and other crimes commonly experienced by residents, small businesses, and

Dennis L. Chinn
9001 NE 37th Place, Bellevue, WA 98004
(206) 459-5326

property owners in Little Saigon specifically. A purpose of this lawsuit is to use discovery to begin to answer the question of ultimate responsibility of the observed failures of City policies.

56.      In addition to what Plaintiff alleges is a complete failure to enforce property crimes in Little Saigon at the street level, there are also larger policy decisions made by City leaders that Plaintiff believes indicate bias, and that have caused a substantial detriment to Plaintiff and the Little Saigon business community.

**The Navigation Center Debacle: Enabling on a Massive Scale**

57.      The Navigation Center homeless shelter was, and is, a highly controversial issue for Little Saigon. Based on similar centers established in San Francisco, the concept is that in order to entice homeless individuals to come to stay at the Navigation Center, there can be no restrictions placed on them. It  was, a "low barrier facility" intended to cater to homeless adults living in encampments with significant behavioral health issues which includes mental health and substance use disorders, life stressors and crises, and stress-related physical symptoms. "Low barrier" meant that living there did not require criminal background checks, credit check income verification, program participation,  or sobriety from "clients". They could store their belongings there and were allowed to stay there with a partner or a pet. Meals were provided on demand. The Center was operated by the Downtown Emergency Service Center (DESC).

58.      A service listed as provided  at the Navigation Center was "intensive case management" whatever that meant. Plaintiff understands that case managers had referral networks to help residents who expressed the desire for counseling, drug rehab, medical or mental health treatment, so services were available. But there was no requirement that any individual in need of any of these services accept help as a condition of living there. Such a requirement might have helped a significant number of individuals, but that would have been imposing a "barrier" and would have been inconsistent with the "low barrier" model the City was pushing at the time.

59.      The Navigation Center was intended to house 75 short-term residents who potentially had serious mental health issues or drug addictions, with no behavior requirements on them whatsoever. Plaintiff alleges that the actual goal was only to get homeless persons to sleep in the facility rather than on the street. Obviously, there was no consideration at all about how such a facility would, and does, contribute substantially to the current problems that plague the 12th and Jackson area that is the focus of this lawsuit. Each night a bed at the Navigation Center was occupied was counted as a "success" irrespective of whether or not that same individual spent his or her days using drugs at the corner of 12th and Jackson. There was no mechanism to monitor any individual's activities while he was not in the Center. In Plaintiff's

Dennis L. Chinn
9001 NE 37th Place, Bellevue, WA 98004
(206) 459-5326

view this was <u>enabling criminal behavior</u> on a massive scale. It was as if the City was telling these individuals, "if you want to do drugs, steal to support your habit, hang out at 12th and Jackson stoned, we will provide you a place nearby to sleep so that you don't have to worry about being unhoused."

60.    This "low barrier" model is consistent with what Plaintiff referred to as the myopic focus of City politicians, that what is needed is to focus on the "housing" element of the problem as championed by current Seattle Mayor Harrell and former King County Executive Constantine as noted in paragraph 35 above.  If homeless individuals can be "housed" they will no longer count as homeless, the visibility of the problem will be reduced, and all the other related problems like mental health issues and drug addiction will be tractable. In Plaintiff's view, the term "low barrier" in this context simply means that the underlying issues faced by an individual are simply ignored, and all that matters is that the individual sleep in the building, rather than on the street, so he or she can be counted as "housed" and a check can be put in the "success" column.

61.    The irony is that at the same time housing the unhoused is said to be  the primary goal, many of the City's other policies work in exactly the opposite direction. The creation of an urban wasteland at 12th and Jackson has negatively impacted the prospects for major housing developments in the area. Per paragraphs 24 and 25  above, the major developer under contract with the Plaintiff walked away because of it. The recent series of City ordinances that limit the ability of low-income housing developers to control the economic health of their buildings has had a severely detrimental effect on their ability to stay afloat. See, "Affordable Housing Owner Sues City of Seattle: Unpacking the Lawsuit", Caitlin McKenney, October 30, 2024, <u>Discovery Institute</u>. City policies are killing off the very thing the City needs most.

62.   The Navigation Center was installed in the Little Saigon area by the City in  2017 over the strong objections of community leaders, local residents, and business and property owners. Plaintiff recalls  being at the meeting where the then newly appointed "homelessness czar", George Scarola, simply announced that the Navigation Center was going into a location at 606 12th Avenue  whether the community liked it or not. Discussion about the rationale of placing it in Little Saigon  was not permitted at that meeting. In retrospect, Plaintiff believes Scarola's refusal to allow any discussion  makes perfect sense. How could he possibly have defended a decision that was based on a conscious policy to concentrate the homelessness, crime , and drug issues in Little Saigon in order to free other neighborhoods from these issues?

63.   The City political leaders were well aware that placing this facility at this location would substantially increase the homeless population in Little Saigon, indeed  that was precisely the point. Relocation of the homeless population from the downtown area into Little Saigon would alleviate the situation downtown and in other more upscale politically consequential

COMPLAINT AND JURY DEMAND                18              Dennis L. Chinn
                                                        9001 NE 37th Place, Bellevue, WA 98004
                                                        (206) 459-5326

neighborhoods. Plaintiff alleges that this was a conscious decision on the part of the City. A minority population that was predominantly immigrants had neither the resources or economic and political clout to fight. At its most base, this was a blatantly racist decision in violation of existing anti-discrimination laws.

64.   Little Saigon community members were also well aware that putting this facility in the community was a very bad idea from the beginning. That is why it was forced down the community's throat by a prior City administration without any prior consultation. Now, after 7 years of making the 12th and Jackson in Little Saigon the worst crime and open drug use location in the City of Seattle, and as a result of continuous community complaints, the City has finally relented, and the Navigation Center was permanently closed as of March 18, 2024. The current City administration simply wants to pretend it was a success and close it down hoping that the community will forget. See "As Navigation Center shelter prepares to leave Little Saigon, its legacy remains contentious," Chetanya Robinson, International Examiner, May 6, 2024.

65.   The reality is that having this facility in LITTLE SAIGON for the past 7 years was a predictable disaster for Little Saigon and has contributed significantly to the untenable situation at our location on 12th and Jackson. Now the current City administration wants to rewrite history, declare the Navigation Center a success, close it down, and avoid any accountability for causing serious harm to Little Saigon residents and business and property owners whose livelihoods have been destroyed. The goal of this lawsuit is to hold the City accountable for damage caused by its actions.

66.   On one hand the Navigation Center was an abject failure. It did not result in moving a significant number of homeless individuals off the streets and into permanent low-income housing which was the primary stated goal. It caused a substantial influx of homeless individuals from other areas of the City, in spite of organizers' assurances that it would not have that effect. It provided a central location for people looking to buy and use illegal drugs. It led to a substantial increase in the homeless population living in Little Saigon, it caused increased theft and violent crimes in Little Saigon and substantially increased the open drug use and sales at 12th and Jackson and the surrounding streets.

67.   On the other hand, if, as alleged in this lawsuit, the goal of forcibly placing the Navigation Center in Little Saigon was actually to concentrate these issues (that no other community would accept) in Little Saigon then the Navigation Center experiment was a smashing success from the viewpoint of City politicians. It did concentrate homelessness, encampments, and addiction in Little Saigon. The primary policy goal was to reduce the homeless population. But, given how resistant the problem has proven to be, especially when attacked with ill-conceived and contradictory policies, Plaintiff

COMPLAINT AND JURY DEMAND            19

alleges that the secondary policy of Seattle politicians was to try to make the problem less visible in more prominent neighborhoods where the political costs of allowing these consequences were potentially more substantial.

68.     The Seattle Navigation Center was based on those in San Francisco, with one major difference. San Francisco currently has seven Navigation Centers throughout the city so an argument can be made that their objective was to reach the homeless population where it lived. Seattle opened a single Navigation Center, in the middle of Little Saigon, without any consultation or input from the community, which strongly suggests an effort to move and concentrate individuals facing these issues into a minority immigrant community.

## PARTIES

69.     Plaintiff Dennis L. Chinn was the owner of the real estate parcel that is the subject of this lawsuit prior to its transfer to Chinn Investments, LLC in 2017.

70.     Plaintiff CHINN INVESTMENTS, LLC is a limited liability formed in Washington State that since 2017 has been the registered owner of the parcel of real estate that is the subject of this lawsuit and of which Dennis L. Chinn is the majority owner and manager.

71.     Defendant City of Seattle is a municipality created under the laws of the State of Washington. The Seattle City Council is its governing legislative body, and the current mayor is Bruce Harrell.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES.

72.     On or about Feb. 6, 2025, Plaintiff filed a claim for damages and declaratory action with the City of Seattle as required by RCW 4.96.020 and Seattle Municipal Code 5.24.005. The claim no. assigned was 25-0164. The claim has not been resolved.

## LIST OF CLAIMS:

Claim I :   Seattle's misguided policies towards homelessness have violated Plaintiff's rights as a U.S. citizen under the 14th amendment of the U.S Constitution.

Claim II :   Racial bias in city of Seattle policies against the Little Saigon neighborhood has harmed Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended.

Claim IIIa. :   The City's actions have violated Plaintiff's right to exclude others from his property and constitute a taking without just compensation under the Fifth Amendment of the U.S. Constitution.

COMPLAINT AND JURY DEMAND                    20                Dennis L. Chinn
                                                               9001 NE 37th Place, Bellevue, WA 98004
                                                                          (206) 459-5326

Claim IIIb. :    The City's actions have violated Plaintiff's right to beneficial use of his property and constitute a taking without just compensation under the Fifth Amendment of the U.S. Constitution.

Claim IIIc. :    The City's actions have violated Plaintiff's right to sell his property and constitute a taking without just compensation under the Fifth Amendment of the U.S. Constitution.

## INDIVIDUAL CLAIMS DETAILED

**Claim I** :    The City's misguided policies towards homelessness have violated Plaintiff's rights as a U.S. citizen under the 14th amendment of the U.S Constitution.

73.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 71.

74    The Seattle City Attorney has the power and the obligation to enforce ordinances intended to protect all residents.

75.    The City has the legislative power to eliminate its own laws against shoplifting, theft, vagrancy, and car-prowling, but they have not done that.  Those laws are still on the books. The City cannot selectively refuse to enforce its own laws to help those it feels sorry for  and ignore the detrimental effects on everyone else. Those laws exist to protect all citizens, including those who live, work, and own businesses or property in Little Saigon. Plaintiff believes that if he walked into a store and walked out without paying for the goods he took he would face criminal prosecution. The City must either let Plaintiff walk as well or stop letting others who claim to be homeless walk. Being homeless is not a protected class. Letting Plaintiff not be charged if he were to openly steal would clearly be absurd. Why is not charging a thief because he is homeless any less absurd?

76.    The City's myopic focus on "homelessness" as the sole point of attack on a very complex set of social problems  has led to its failure to enforce its own laws  prohibiting vagrancy, open drug use and sales, car prowling, shoplifting and theft, in the Little Saigon area. That selective failure to enforce its own laws violates Plaintiff's rights under the 14th 'amendment of the U.S. Constitution and has made it impossible for small businesses (and large for that matter) to survive in the Little Saigon area.

**Claim II. :**    Racial bias in City of Seattle policies against the Little Saigon neighborhood has harmed Plaintiff in violation of Title VII of the civil rights act of 1964, as amended.

77.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 71.

COMPLAINT AND JURY DEMAND                21                Dennis L. Chinn
                                                9001 NE 37th Place, Bellevue, WA 98004
                                                (206) 459-5326

78.  The City of Seattle has engaged in a discriminatory application of policies to combat homelessness that has resulted in a substantial imbalance in the negative impacts of the problem. In particular, the City's focus on alleviating the issue in the downtown area has caused a substantial migration of the homeless population into the Little Saigon neighborhood. This was not a surprise, but was the result of a conscious policy. Forcing the Navigation Center down the throats of Little Saigon was part and parcel of this effort. "Low barrier" in this context simply means that residents can still do whatever illegal or antisocial activities they want as long as they sleep in the Center.  So, enforcing laws to control open drug use, vagrancy, and nuisance regarding those "permitted activities" would be inconsistent with the presence of the Navigation Center. If, as Plaintiff alleges, the placement of the Navigation Center was precisely to cause the homeless population to congregate in the Little Saigon instead of the downtown area and the Pike Place market area, this all makes perfect sense. Except, of course, that it tramples the rights of those who live, work, and own property in Little Saigon.

79.   Plaintiff alleges that investigation and analysis of law enforcement activity patterns in various neighborhoods in the City will show a <u>higher</u> level of enforcement against shoplifting, theft, open drug use and sale, and vagrancy in more "upscale" areas of the City than in Little Saigon.

80.   Plaintiff alleges that in certain instances, the bias was conscious, in that City of Seattle leaders consciously disfavored the minority immigrant community of Little Saigon who did not have the organized capacity to protest, the economic resources to resist, nor the legal capacity to appeal to the courts for redress. The lack of respect is especially galling. This lawsuit is Plaintiff's attempt to level the playing field.

81.   In November 2015, then mayor Murray announced a state of emergency over the issue of homelessness in Seattle and in August 2016 hired George Scarola as" homeless czar." The Navigation Center was installed a couple of blocks away and brought a huge influx of homeless individuals, many with drug addictions, mental health issues, and other problems that prevented them from holding jobs and providing for themselves. Plaintiff contends that the City's true intent in siting the Navigation center in the Little Saigon area was to concentrate the problem in an immigrant minority community in  order to reduce the problem in other areas of the City. Immigrant communities have limited resources, do not speak English well, do not complain, and hence have no political power. This clearly evident in the way the Navigation center was forced down the throat of the Little Saigon community by the then mayor's office without any prior notice, any input into the process, or any chance to object. Plaintiff attended the meeting at which the announcement was made by the newly appointed "homelessness czar", George Scarola.

COMPLAINT AND JURY DEMAND                     22                Dennis L. Chinn
                                                                                        9001 NE 37th Place, Bellevue, WA 98004
                                                                                        (206) 459-5326

82.     The Navigation Center was designed to be a "low barrier" facility. The apparent goal was to get homeless individuals to sleep in the facility, so that "success" was measured by the number of individuals who slept in the facility each night. Because any sort of coercion was considered demeaning and inappropriate, every effort was made to make sleeping in the facility as inviting as possible, hence the concern that there be minimal "barriers" to homeless individuals deciding or their own accord to sleep in the facility. Plaintiff recalls that tenants were allowed to bring any pets, boyfriends or girlfriends, the center would store shopping carts of belongings, and most importantly there was no requirement of sobriety, freedom from drug use or addiction, or mental health issues. There was no requirement that residents in any way seek or accept help. Using drugs inside the facility was discouraged, and weapon were not allowed inside, but what residents did outside the center's doors was not restricted in any way. The net effect was that the area around the center and in the vicinity or 12th and Jackson, two blocks away, became rampant with open drug sales and use, theft, EBT fraud, violence, large encampments and the filth that typically accompanies them.

83.     In addition to the debacle that was the Navigation Center, Plaintiff alleges that there has been over many years a conscious effort to locate low- income housing in the little Saigon area for the same reasons the Navigation Center was located there over the strong objections of the community.  Immigrant communities have limited resources, do not speak English well, do not complain, and hence have no political power.  City of Seattle low-income housing funding programs appear to exhibit this bias.

84.   Plaintiff alleges that these actions violated Title VII of the Civil Rights Act of 1964, as amended.

## Claim III:   Inverse condemnation claims as a means to restore balance in policymaking

85.   Plaintiff hereby re-alleges and incorporates by reference the allegations contained  in Paragraphs 1 through 71.

86.   Plaintiff alleges that the chosen policies in pursuit of a public benefit have disproportionately imposed substantial costs on specific subgroups of the local population, viz., small business and property owners in Little Saigon. In particular, the economic impacts on Plaintiff's rights with respect to his land at 12th and Jackson Street have been very severe. That the Defendants have the legal right to pursue public policies that harm individual property owners is not in question, but doing so without paying "just compensation" violates the Takings Clause of the 5th amendment of the U.S. constitution under existing U.S. Supreme Court case law. Penn Central Transportation Company v. City of New York , 438 U.S. 104.

87.   The intent of the Defendant's policies was to try to solve the problem of widespread homelessness in the City of Seattle. Plaintiff alleges that the City's basic approach was, and still

COMPLAINT AND JURY DEMAND            23            Dennis L. Chinn
                                                   9001 NE 37th Place, Bellevue, WA 98004
                                                   (206) 459-5326

is, mis-guided, that various policy choices are in direct conflict with other policy choices trying to address the same issue, and that after millions of dollars expended annually, the reality is that the problem has not been solved, and in fact now is worse than it ever has been. It may well be too late to save what remains of Little Saigon, especially since City of Seattle leaders seem intent on "doubling down" on their failed current policies. This is the definition of idiocy. Plaintiff's hope is that this lawsuit will result in City of Seattle policymakers being forced to factor in the heavy price paid by Plaintiff and others in the Little Saigon business community into their future policy decisions about how to solve the homelessness, crime, and open drug use and sales in Seattle.

88.    A recent article by John Groen (2024), "Takings, Original Meaning, and Applying Property Law Principles to Fix Penn Central," Touro Law Review, Vol. 39: No. 4, Article 4, adds a great deal of clarity to the understanding of Takings Law as set forth in U.S. Supreme court cases, and shows that the  correct  interpretation of the word "property" essentially eliminates the confusion that has resulted from the Penn Central test. The "property" in takings cases is not a particular piece of land or physical object, it is the "rights" that are inherent in ownership that are to be protected. The value of the property flows from the rights of the owner, not the object itself.

89.    Groen demonstrates that this interpretation is entirely consistent with historical Supreme Court case law in this area and expresses hope that when an "appropriate" case reaches it, the Court will clarify the confusion caused by Penn Central and put takings law on a more solid footing.  As a PhD economist, Plaintiff alleges that Groen's analysis is consistent with the approach that would be taken by 9 out of 10 economists wearing blindfolds.

90.    Rather than allege generalities, Plaintiff will apply this analysis to his current situation. Plaintiff owns a parcel of land at the intersection of 12th and Jackson in Seattle, WA. For takings analysis purposes this land is not the "property" at issue. The property is the set of inherent rights that attach to Plaintiff because of his ownership of the parcel of land. Broadly stated, these rights are: 1) the right to possession, 2) the right to exclude others, 3) the right to alienate (sell), and 4) the right to beneficial use of private property. The takings clause of the constitution is designed to protect these rights. The loss of any of these rights can result in a loss in value, but the constitutional violation is the loss of rights, not the resultant loss in value. The measured loss in value is the measure of damages which is due once a constitutional violation is found.

**Claim IIIa.** :   The City's actions have violated Plaintiff's right to exclude others from his property and constitute a taking without just compensation under the Fifth Amendment of the U .S. Constitution.

COMPLAINT AND JURY DEMAND                    24                    Dennis L. Chinn
                                                                          9001 NE 37th Place, Bellevue, WA 98004
                                                                          (206) 459-5326

91.     Plaintiff alleges that Defendants' actions have violated his <u>right to exclude others</u>, and that this constitutes an unconstitutional taking without just compensation.

92.     Defendants have allowed homeless encampments to exist for long periods on public property close to Plaintiff's property. The property to the north of Plaintiff's property is the Yesler Terrace neighborhood. Between the properties is a right of way and walking path that is owned by the Seattle Housing Authority. A large encampment was allowed to exist for many years in that right of way, in spite of numerous complaints from Plaintiff, residents of Yesler Terrace buildings, and residents of the adjacent condo building to the west called Pacific Rim Center.

93.     Because of the close proximity of this encampment to Plaintiff's property, the encampment constantly spilled over onto the northern portion of Plaintiff's property, resulting in large scale encampments on several occasions.  In years past, there was a unit of the Seattle Police department called the <u>Navigation Team</u> whose officers and outreach workers would assist private property owners clear encampments by arranging for outreach and social workers to come and talk to the residents of the encampment and assess their individual situations, provide counseling, direction and resources and tell the residents that they could not remain and had to move on. Then the owner would hire a hazardous waste removal contractor who would clear the area of drug paraphernalia, used syringes, human feces, and other hazardous materials. After that the property owner could hire a different group to remove all the building materials and garbage.  Plaintiff did this routine twice over a period of a few years  at a cost of approximately $40,000.

94.     Then, the SPD Navigation Team was defunded by the City Council and then disbanded in October of 2020. The purpose of the City Council defunding the Navigation Team was to eliminate the clearing of illegal encampments, including those on private property, and from that point on Plaintiff had no ability to safely remove homeless encampments from his property, the encampments simply stayed. Plaintiff alleges that the disbanding the SPD Navigation Team further harmed Plaintiff by eliminating his ability to remediate the consequences of illegal encampments on his own Property. The City council effectively eliminated the only lawful means Plaintiff had to control illegal encampments on his property. They chose to allow criminal activity on private property by denying Plaintiff his constitutional right to protect himself from it.

95.     By allowing homeless encampments on public property in close proximity to Plaintiff's property and by eliminating the SPD Navigation Team, the City made it virtually impossible for Plaintiff to exclude homeless individuals from also occupying his property. Plaintiff's right to exclude squatters and homeless drug users from his property has been compromised by the

COMPLAINT AND JURY DEMAND                    25                    Dennis L. Chinn
                                                                      9001 NE 37th Place, Bellevue, WA 98004
                                                                      (206) 459-5326

City's actions. This is a clear violation of Plaintiff's right to exclude others and constitutes a violation of the takings clause of the U.S. constitution.

96.    Aside from the specific encampments allowed by Defendants in close proximity to Plaintiff's land, the forced placement of the Navigation Center alleged above, Paragraphs 57 – 68, also constitutes a violation of Plaintiff's right to exclude others. The result of the Navigation Center for the 7 years of its existence contributed to the horrible conditions faced by Plaintiff at 12th and Jackson, a few short blocks away from the Navigation Center.

97.    A recent report by Barb Biondo of the Seattle Police Department shows the conditions in Little Saigon and the numerous recent Seattle Times articles listed in paragraph 44 of this complaint highlight the extreme amounts of public drug use and crime, with several of the most serious crimes directly connected to residents of the encampments allowed by Defendants for the past many years.  **Pho Dep (Beautiful Neighborhood),** Friends of Little Saigon, 2024,  Appendix A: Little Saigon Crime Data.

98.    When a local area like Little Saigon is overrun by individuals who are allowed to engage in open drug use, theft, and other criminal activity, it is virtually impossible for local business owners to exclude those individuals from their places of business. This violates their right to exclude undesirable elements from their properties and constitutes a clear violation of the Takings clause of the 5th Amendment of the U.S. Constitution.

**Claim IIIb. :**    The City's actions have violated Plaintiff's right to beneficial use of his property and constitute a taking without just compensation under the Fifth Amendment of the U.S. Constitution.

99.    Plaintiff further alleges that the City's actions have violated his right to beneficial use of his property, and that this constitutes an unconstitutional taking without just compensation. This claim follows a long tradition of cases involving airport noise, water rights, and environmental restrictions, and police power.

100.    The situation is intellectually closely akin to takings cases in which a private property owner's use of water from a stream that runs by his property is reduced or eliminated because the water flow is redirected to serve a neighboring community. See "Fifth Amendment Taking Claims arising from restriction on the use and diversion of surface water," William J. Shapiro, Vermont Law Review, Vol. 39, 753 (2015).

101.    When Plaintiff first opened the Asian Plaza there were very few other shopping centers in Little Saigon. Plaintiff's approach was "build it and they will come", and they did. Over the course of the next few years the Asian Plaza became the center of a thriving immigrant community.  All four corners at 12th and Jackson came to house numerous small ethnic

Dennis L. Chinn
9001 NE 37th Place, Bellevue, WA 98004
(206) 459-5326

businesses. The collective efforts of these small ethnic merchants resulted in the customer base expanding rapidly and the Asian Plaza and its tenant businesses thrived. On the weekends business was so good that the Asian Plaza parking lot was at overflow capacity from Friday through Sunday.  And it was not just the resident population. Little Saigon was a destination for people (Asians and non-Asians alike) who flocked to the area every weekend to shop, dine, and just enjoy the festive scene. Crime or open drug use was not a concern.

102.    Around 2015 the situation in Little Saigon began to change. As homelessness began to increase, Little Saigon, like all neighborhoods felt the impact. Plaintiff does not allege that the City "caused" the homelessness crisis in the Seattle area, but rather that the policies adopted very early in Seattle grossly exacerbated the situation in Little Saigon and were responsible for its continuation.

103.    Plaintiff's specific allegation with regard to the loss of his right to beneficial use of his property is that by allowing rampant drug use, crime, and squalor in the Little Saigon neighborhood, the City has driven away the strong customer base that Plaintiff, his tenants, and other local businesses developed through their efforts over many years of hard work, and to which they have the right to continue to access by virtue of their ownership of property and businesses in the area.  In a sense, Defendants have rerouted the customer base resource to other areas in the City where customers can visit, and shop, and dine without stepping over homeless vagrants, watching out for used syringes, and without fear for their personal safety. Eliminating Plaintiff's access to that resource (that he helped create) without compensation violates the Takings clause of the Fifth Amendment of the U.S. Constitution.

104.    An additional element of the City's causing Plaintiff's loss of beneficial use of his property relates to the fire that completely destroyed the building on June 10, 2024. Plaintiff hereby re-alleges and incorporates by reference the allegations contained  in Paragraph 23 of this complaint.

105.    Plaintiff alleges that while the City did not start the fire, it certainly created conditions that substantially increased the risks of such an event.  The City's actions significantly increased the likelihood that Plaintiff's building would be burned down and imposed disproportionate costs on Plaintiff without just compensation in violation of the Takings clause of the Fifth Amendment to the U.S. Constitution.

**Claim IIIc. :**   The City's actions have violated Plaintiff's right to sell his property and constitute a taking without just compensation under the Fifth Amendment of the U.S. Constitution.

106.    Plaintiff alleges that the City's actions created conditions that made it impossible for him to sell his property and have thereby violated his right to sell his property.

COMPLAINT AND JURY DEMAND                27                Dennis L. Chinn
9001 NE 37th Place, Bellevue, WA 98004
(206) 459-5326

107.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 24 and 25. For 2-1/2 years Plaintiff was under contract with a national REIT to sell the property for housing development. After spending several million dollars and working with the City building department to the point that all the necessary permits were ready to pull, the buyer abruptly breached and would not close the sale. The failure of that sale to close is directly attributable to the terrible investment climate the City has created and allowed to persist in the Little Saigon neighborhood. Construction is booming in other areas of the City, but understandably not in Little Saigon. Plaintiff alleges that the failure of the buyer to close was a direct result of the buyer's inability to find a lender who would finance a project in the Little Saigon, for obvious reasons. Lenders are simply not willing to invest in the neighborhood with the most crime, the most open drug users hanging out on the streets, the filthiest streets and sidewalks, and the most homeless encampments in the City of Seattle.

**Inverse condemnation as a mechanism for correcting unintended disproportionate impacts of policy decisions**

108.    The costs of the City's homelessness policies in Little Saigon are being borne in substantial part by Plaintiff and his now-defunct tenants (and many others in the same situation in Little Saigon) at the same time the problem is being made worse by the City's continuation of those same policies. The costs imposed on Plaintiff and other parties other than the homeless were not considered in the City's decision-making process and this failure has resulted in a very skewed policy environment. Each act of theft in a grocery store that is allowed, results in a long series of downstream consequences for others who have done nothing to deserve such treatment. The grocery store loses money, business drops off, employees get laid off and lose their livelihood. Every act of open drug use that is allowed affects many others besides the user. Criminal elements are invited to come into an environment where there is no enforcement, and they can operate openly. Pedestrians feel unsafe and stop coming down into the area to patronize businesses and restaurants and go elsewhere to shop. Businesses are forced to close, and another innocent livelihood is lost.

109.    This is the essence of Plaintiff's inverse condemnation claims. It is the sole mechanism by which Plaintiff can seek to recover the substantial costs imposed on him by city policies that violate his rights under the Takings clause of the Fifth amendment to U.S. Constitution. The cost of programs to try to help solve the homelessness issue should be borne by the population as a whole, not just by small business and property owners in Little Saigon. Reimbursing them for the costs they have unfairly borne puts the cost back where it belongs and hopefully will result in the City taking account of the widespread, sometimes unintended, costs their myopic policies impose on so many other innocent parties.

COMPLAINT AND JURY DEMAND                 28                 Dennis L. Chinn
                                                                          9001 NE 37th Place, Bellevue, WA 98004
                                                                          (206) 459-5326

110.    A takings claim under the Fifth Amendment of the U.S. Constitution is essentially a no-fault liability claim. The intent or negligence of the policymakers that caused the harm does not matter.  It is not a tort claim. Nor does it matter whether the policies were mis-guided or not. There is no need to compare the intended benefits of the policies with the harm caused to others. The question is who should pay for those benefits? Society as a whole, or a group of immigrant small business and property owners?  If Plaintiff's inherent rights that flow from his ownership of a property were violated and just compensation was not paid, there was a taking under the Fifth Amendment to the U.S. Constitution. It is not necessary to measure the decline in the value that Plaintiff experienced to determine whether or not there was a taking.  That is determined by an analysis of whether Plaintiff's rights that stem from his ownership were violated. In this case, Plaintiff believes they were. Measuring the magnitude of the harm Plaintiff suffered is to be accomplished in the damages phase.

**Pro se litigants and access to the judicial system**

111.    Plaintiff is aware that Courts generally tend to disfavor pro se litigants because they can cause logistical issues due to unfamiliarity with the complex Court rules that must be navigated in order to gain access to the judicial system. Plaintiff has watched television interviews of individual Little Saigon business owners who say they are so fed up with the situation in Little Saigon that they are going to "sue the City."  They do not understand that theirs is an idle threat that may make them feel better but simply has no force whatsoever. These individuals have no understanding of what suing the City means, they have limited English language skills, they have no legal training, they have no financial resources, they have no access whatsoever to the judicial system, and so they suffer their unjust indignities in private. This is not how it should be.

112.    Plaintiff is likely one of very few potential litigants in the Little Saigon neighborhood that might be able to get a hearing of his claims before a neutral arbiter. Plaintiff has a JD degree, is an inactive/retired member of the WSBA (#14295), is educated  (PhD in economics, UC Berkeley 1976, former assistant professor at Stanford University 1976 – 80),  has some financial resources, is a native English speaker, owns property at the worst intersection in the City of Seattle, and has suffered substantial losses as a result of the City's ill-advised policies. And yet he is compelled to litigate Pro Se because of the high cost of hiring representation. So, while Plaintiff apologizes to the Court and opposing counsel in advance for any inconvenience he might cause in the course of this litigation, the sad truth is that this is what access to the judicial system looks like from Little Saigon.

COMPLAINT AND JURY DEMAND                29

**DAMAGES**

113.    The appropriate measure of compensatory damages herein is the loss of revenue and/or property value that Plaintiff has suffered as a proximate result of any actions of the City found to have been in violation of Plaintiff's rights.  The most significant elements of that loss are lost rental income, loss of the building value due to the fire, and the failure of the sale of the property to close because of the conditions the City created and allowed to continue around the 12th and Jackson area and adjacent streets.

114.    The City's mis-guided policies  have  allowed a large group of homeless individuals to live on the streets in the vicinity of 12th and Jackson, and on Plaintiff's property itself.  This has resulted in the creation of a hostile personal and business environment in the area and has made it impossible for small ethnic business tenants in Plaintiff's building to survive. One by one Plaintiff's tenants, even after Plaintiff made substantial rent concessions, were forced to close their doors, resulting over time in the building becoming completely vacant.

115.    In the years before the City's policies caused the decline of the Little Saigon  starting around 2015, the total annual gross rents were on the order of  $327,000  per annum. The last of Plaintiff's tenant to close their doors, Viet Wash Supermarket, vacated the building in 2022. So, from 2015 to 2022 gross annual  rents generated by Plaintiff's Asian Plaza shopping center declined from approximately  $327,000 to zero. Assuming a roughly linear decline over those years  and adding 2023 and 2024 lost rent yields a total estimated loss of rental income of $1,974,030. Plaintiff alleges this is a reasonable estimate of the revenue loss incurred by Plaintiff as a result of the loss of tenants caused by the City's actions. Plaintiff includes this amount in compensatory damages sought.

116.    After the last tenant closed and the building was vacant, the presence of a large group of homeless individuals living on Plaintiff's property also made it logistically impossible for him to secure the then-vacant building against intruders, some seeking shelter and warmth and some seeking to steal whatever they could find, and perhaps some that wanted to burn it down. In all likelihood, this was the direct cause of the fire on June 10, 2024, that destroyed his vacant building. Plaintiff believes the City's  unconstitutional actions were a proximate cause of the loss of the building, which was valued for insurance purposes at approximately $6 million. Plaintiff therefore also seeks additional compensatory damages in that amount. Plaintiff also seeks reimbursement of the $4,400 in vacant building monitoring fees charged Plaintiff by the City and the approximate $40,000 expense Plaintiff had to pay to clear hazardous encampments from his property.

117.    As set forth in Paragraphs 24 - 25 above, as a last resort to try to get out from under a growing financial burden, Plaintiff listed the property for sale with CBRE Commercial Real

COMPLAINT AND JURY DEMAND                    30                    Dennis L. Chinn
                                                                                        9001 NE 37th Place, Bellevue, WA 98004
                                                                                        (206) 459-5326

Estate.  In December of 2021  Plaintiff entered into a purchase and sale agreement with a respected national developer. Plaintiff alleges that the hostile personal and business environment created by the policies of the City in the 12th and Jackson area was a proximate cause of the  buyer, breaching the contract after 2-1/2 years and failing to close the transaction. The contract price was $21 million, and Plaintiff believes that sum should be included in the damages herein sought.

118.   Watching one's family legacy gradually being transformed from  a thriving shopping center into a pile of rubble in the middle of an economic wasteland in spite of one's own best efforts, and because of counter-productive City of Seattle policies trying to address homelessness is a very traumatic experience. This has been Plaintiff's journey for the past 10 years. Whether this experience rises to the level of compensable punitive damages is within the Court's purview to decide, but Plaintiff hereby requests emotional distress damages in an amount deemed proper by the Court.

119.   In addition to seeking recompense for the actual damages caused to Plaintiff by the City's violation of his constitutional rights, Plaintiff is also seeking to have the court direct the City to end selective non-enforcement of their own ordinances against thieves and open drug users in Little Saigon as part of their strategy for concentrating the homeless population in the Little Saigon neighborhood.

120.   Throughout this complaint Plaintiff has referred to mis-guided City of Seattle homelessness policies. If policies are well-intentioned by smart people, how can they be misguided? For that, a trip to the land of unintended consequences is warranted. The plans submitted by the buyer under contract with the Plaintiff show a project consisting of 420 new housing units, some small commercial retail spaces, a parking garage, and numerous public open spaces. The project would have modernized and renewed the area between 10th and 12th Avenues all the way up to the adjacent newly redeveloped Yesler Terrace to the north and would have eliminated the existing urban blight on the north side of Jackson Street.  It could have gone a long way toward  eliminating the current 12th and Jackson mess that is currently plaguing Little Saigon and was exactly the kind of private project the City of Seattle encourages to improve the local supply of housing units. After 2-1/2 years of work with SDCI (Seattle Department of Construction and Inspections) the MUP, building permits, and the demolition permit were all approved and ready to pull. Construction could have started immediately.  And yet the City's own homeless policies directly caused that project to fail at the 11th hour because private money is smart enough not to invest in slum areas that are being made worse by the City's own policies. The irony in this is so thick one would need a saw to cut through it. If this weren't so costly to Plaintiff and his family, and the Little Saigon community it would be funny.

COMPLAINT AND JURY DEMAND                    31                Dennis L. Chinn
                                                                                9001 NE 37th Place, Bellevue, WA 98004
                                                                                        (206) 459-5326

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiff prays for relief as follows:

1.     For a declaration that the City of Seattle's acts, policies, practices and procedures complained of herein violated Plaintiff's rights as secured by the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

2.     For a declaration that the City of Seattle's acts, policies, practices and procedures complained of herein violated Plaintiff's rights as secured by Title VII of the Civil Rights Act of 1964, as amended.

3.     For a declaration that the City of Seattle's acts, policies, practices and procedures complained of herein constitute an unconstitutional taking without just compensation under the Fifth Amendment to the U.S. Constitution.

4.     Enter an order for compensatory and punitive damages for Plaintiff's Equal Protection Claim in an amount to be determined by the Court.

5.     Enter an order for compensatory and punitive damages for Plaintiff's Title VII Claim in an amount to be determined by the Court.

6.     Enter an order for actual damages for Plaintiff's Inverse Condemnation Claims in the minimum amount of $30 million.

7.     Enter an order directing the City of Seattle to establish an inverse condemnation fund sufficient to compensate all small business owners in the Little Saigon area for any and all losses they incurred, either because they suffered loss of income and/or were unable to keep operating, because of the wrongful actions of the City of Seattle.

8.     Enter an order prohibiting the City of Seattle from selectively enforcing (or failing to enforce) its own ordinances against vagrancy, public drug use and sales, and theft, to benefit one group versus another.

9.     Award attorneys' fees and costs pursuant to 42 U.S.C. s 1988 and any other applicable legal authority;  under Title VII of the Civil Rights Act of 1964, as amended; pursuant to prior precedent in Fifth Amendment inverse condemnation decisions: and any other relevant provisions providing for attorneys' fees and costs.

10.     Enter an order for nominal damages and such other relief as the Court deems just and proper.

Dennis L. Chinn
9001 NE 37th Place, Bellevue, WA 98004
(206) 459-5326

1    Respectfully submitted this 4th day of August, 2025.

2

3

4

5    _____

6                    Dennis L. Chinn, Pro Se

7                    WSBA #14295 (retired/inactive)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND JURY DEMAND           33           Dennis L. Chinn
                                              9001 NE 37th Place, Bellevue, WA 98004
                                                        (206) 459-5326