# APPENDIX TO OPPOSITION TO MOTION TO DISMISS

# FIRST AMENDED COMPLAINT

1. Affidavit of BRIAN S. CHINN

2. Notice of Violation sent from Seattle Department of Construction and Inspections to CHINN INVESTMENTS, LLC on August 05, 2025.

3. Original complaint filed in <u>Brown v. Board of Education</u>, Feb. 26, 1951.

```
_____FILED    _____ENTERED
_____LODGED_____RECEIVED
```

OCT 15 2025

AT SEATTLE
CLERK U.S. DISTRICT COURT
BY   WESTERN DISTRICT OF WASHINGTON
                                DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTTLE

| | |
|---|---|
| DENNIS L. CHINN, an individual, ) | |
| And ) | |
| CHINN INVESTMENTS, LLC, ) | Case No. 2:25-cv-01456-RAJ |
| a Washington Limited Liability Company, ) | **AFFIDAVIT OF BRIAN S. CHINN** |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| CITY OF SEATTLE ) | |
| Defendant. ) | |
| ) | |

I, Brian Chinn, of Yarrow Point, In King County, Washington, being duly sworn, depose and affirm upon oath:

1. The purpose of this affidavit is to support our request to the Court to amend the complaint to add a claim for personal injury to me in particular as a result of the policies adopted by the City in its efforts to solve the homelessness crisis.

2. I am a member of Chinn Investments, LLC, the owner of the property that holds title to the 12th and Jackson property that is the subject of this lawsuit against the City of Seattle.

3. One of my roles in the company is that I am in charge of securing the property against intruders and interacting with local law enforcement in that context. In that role I have spent many hours at our property in the 12th and Jackson Street area.

4. In the first amended complaint we filed on September 9th 2025 in this lawsuit (2:25-cv-01456-RAJ), the most recent episode in this saga is recounted in paragraphs 141 to 144. I was personally involved in the events recounted in those paragraphs and attest to their accuracy.

5. The salient points of those paragraphs are that I received a letter from Antoine Anderson, a housing and zoning inspector with the City of Seattle, dated August 5th 2025 informing me that all the trash on the back hillside of our property had to be removed within 30 days or we would face fines of up to $150 per day for the first 10 days after the September 4 deadline, and up to $500 per day after that. A true copy of that letter is attached to this affidavit.

6. The "trash" at the site was actually a homeless encampment and included garbage, human feces, a large quantity of used syringes, tents, and building materials used to build housing structures.

7. I explained to Mr. Anderson that the encampment on our property was actually an extension of a close by encampment on adjacent property owned by the City of Seattle's Housing Authority and that the City had allowed this camp to remain for many months and that it was impossible for us to keep our property clear of trash and debris as long as the City allowed an adjacent encampment to remain.

8. After talking to the inspector and reaching out to the mayor's office I was informed that the City was planning to remove the encampment on City property that was adjacent to ours, and that we had to remove the encampment and clean up all the debris in order to avoid the fines.

9. As noted in the complaint at paragraph 138, this is the third time we have cleared a homeless encampment from the same location on our property. This third time I called SPD for help in removing people living in the encampment, I hired a local hazardous waste removal company called Bio Decon Solutions to remove the hazardous material, including syringes, and other debris from the encampment. Lastly to try and prevent the camp from reestablishing itself I hired a Landscaping company to cut all the blackberries and hired a local contractor to repair the fence that had been severely damaged by homeless squatters breaking into our property. The total our-of pocket cost for this required cleanup was $22,500.

10. On Saturday September 20, 2025, I went down to the plaza to make sure there were no trespassers camping on our northern hillside and to remove loose syringes. We needed to have the area clear of campers so that our landscaping crew could safely enter the area and clear the blackberry brushes.

11. I entered the brush from the Northern side. I carried with me a reaching grabber and a bucket that I use to pick up discarded syringes. After clearing the western portion of syringes I walked down the hill from main street on the eastern edge of the black berry brush. I found a person laying on the ground with syringes around him. The individual was non-responsive to verbal communications. I nudged him with my grabber, and he rolled over and ignored me. I explained that he could not be there because we were going to clear the area and he was on private property. He did not respond.

12. I called 911 and reported that there was an individual illegally trespassing on my property and I need him removed so that my work crew can enter the area. I waited to see if any police would show up but as my crew was arriving, I walked back down to try to get him to move. I poked him again with my grabber and told him he had to leave. At this point the individual jumped up screaming obscenities at me. He grabbed a large branch from a tree we had downed recently and started swinging it at me screaming obscenities. He continued to approach, and I backed down the hill slowly using my grabber to shove him back to maintain distance and avoid being struck. I continued to back down until I was blocked by the fence on the southern edge of the hill.

13, At this point he turned around and walked up the hillside screaming at me. He proceeded to walk down Main street to the east. I called 911 to update my prior call and told the dispatcher that the individual had assaulted me with a branch and that he was walking down Main. The 911 operator updated the call and advised me I should not follow him.

14. Police were never dispatched to deal with this dangerous individual. Later that night, I estimate 5-6 hours later, I received a phone call from an officer so that I could file a phone report. There was never a physical response to my 911 call.

15. Paragraph 30 of our first amended complaint details an earlier episode during which I was confronted by a thief inside our building in which I felt very threatened. This is my recollection of that encounter.

16. On or about October 31 2023 I went to the old Saigon bistro restaurant location in our building to re-secure the security gate that had been broken. I entered the building to make sure that no one was hiding inside. Upon opening the exterior security door, a man startled me as he walked out of the utility room. I told him he had to leave, and he informed me he needed to get his bike out of the building. I backed out of the entry way and put the dumpster between me and him in case he rushed me as he exited the building.

17. He angrily exited the building and moved west through the parking lot. When I went in to inspect the utility closet, I could see that he had been in there stripping copper wire

out of the electrical feeds to the building. The meters had been popped out of the meter bases and a lot of the copper feed wire was gone.

18. I called the police and waited but no one arrived. I walked down on to Jackson St and noticed a police cruiser parked on the road. I walked up to the window and told the officer that we had a break-in, and I caught the guy in the act and wanted to file a police report. I was informed that he could not help me right then because he was already involved in another case, but he agreed to meet me the next morning and take my police report.

19. I met officer Stuckey there the next morning and filed my police report and submitted the video I had of me encountering the individual in the building. Nothing ever came of this report.

20. Each time I go down to check the site I encounter a number of homeless addicts on our property, and I tell them they cannot remain on the property and that they have to move on. I am always cordial and polite so as not to give them a legitimate reason to react in an angry way. Generally, this works, and they simply move on but often does not.

21. I am continually concerned for my safety when I am interacting with these individuals because there can be large numbers of them, I have no way to tell if they are armed, I have been threatened many times with various weapons in the past, and there is a history of stabbings and shootings in the vicinity of 12th and Jackson. In fact, in the multiple stabbing incident (10 victims in a 37-hour period) that occurred on November 8, 2024 where the assailant escaped by running across our property, the police found the weapon he used in the attacks on our property.

22. My interpretation of what is happening here is that the City has caused this concentration of homeless individuals in the vicinity of our property who behave in anti-social ways and then requires me to remove them from my property by threatening to levy substantial fines on me if I do not. When I am actively dealing with a situation my calls to 911 do not bring a police response, so I am put in jeopardy of physical harm and at times feel threatened.

Under penalty of perjury, I hereby declare and affirm that the above stated facts, to the best of my knowledge, are true and correct.

DATED this 14 day of Oct 2025

*[signature]*

Brian S. Chinn

STATE OF WASHINGTON.

COUNTY OF King

On this 14th day of October, 2025, personally appeared before me, the undersigned notary, BRIAN S. CHINN, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged it to be his free and voluntary act for the uses and purposes mentioned in the instrument.

Dated: Oct 14, 2025

*Caleb H Olson*

NOTARY PUBLIC

My Commission expires: 06-01-2026

*[Notary Seal: CALEB H OLSON, COMMISSION EXPIRES, NOTARY PUBLIC, 120827, 06-01-26, STATE OF WASHINGTON]*

 **Seattle** Department of Construction & Inspections

## Land Use Code Notice of Violation
### CASE NO. 1061454-VI

August 05, 2025

Property Owner: **CHINN INVESTMENTS LLC**
Property known as: **1032 S JACKSON ST**
APN: 8591900145
LOTS 1-6 & 13-18, BLOCK 4, TERRYS 4TH ADD, EXC THE SOUTH 15 FEET OF LOTS 1-6, LESS ST (CO #15291), AS RECORDED IN RECORDS OF KING COUNTY, WASHINGTON.

Chinn Investments LLC
DENNIS CHINN
9001 NE 37TH PL
Yarrow Point, WA 98004

We received a complaint about this property. Housing and Zoning Inspector **Antoine Anderson, 206-615-0378** or **Antoine.Anderson@seattle.gov**, investigated and found a violation or violations of the Seattle Land Use Code, Chapter 23 of the Seattle Municipal Code 23.40.002, 23.42.010, 23.42.020, 23.42.056, 23.49.144, 23.84A.020 and 23.90.002

**THE VIOLATION(S) MUST BE CORRECTED BY THURSDAY, SEPTEMBER 4, 2025.**
The specific violation(s) and correction(s) are as follows:

1. Discontinue maintenance of an encampment/outdoor camping on an undeveloped lot in a DMR/C 75/75-95 zone or obtain a permit and final approval to establish a transitional encampment interim use.
2. Remove all associated outdoor storage of junk from the property.

PENALTIES/FINES
You may be subject to a civil penalty (fine) for a continued violation.
- For the first ten days of noncompliance, the penalty is up to $150 per day beginning the day after the deadline above.
- The penalty increases to up to $500 per day for each violation after the first ten days.
- Penalties continue to add up until the date the corrections are completed, and the Housing and Zoning Inspector has inspected and confirmed that the property is in compliance.
- Certain violations are subject to additional penalties.

If you do not correct the violations by the deadline listed above, the city may file a lawsuit against you to collect the penalty. If this case goes to court, the city would have to prove that the code violation exists/existed in order to collect any penalties.

REQUEST FOR EXTENSION
You can ask the inspector for more time to complete correction of the violations. The request must be in writing and must explain why you need more time. Extensions will be granted only if substantial progress toward compliance has already been made.

INSPECTION CHARGES
An inspection charge of $274 is charged for each inspection beyond the first two inspections in this case.
- The third inspection and each subsequent inspection will be charged.
- This charge is in addition to any per-day or other penalty or fine and you will be billed for this charge.

RECORDING
We may file a copy of this Notice of Violation with the King County Recorder's Office.

DIRECTOR'S REVIEW
If you disagree with this Notice of Violation, you may request a review of this Notice by a Department Review Officer. The Review Officer will review the facts of the case and determine whether the Notice of Violation was properly issued. The Review Officer can extend the compliance date for a short period of time even if the violation is upheld. But the Review Officer cannot allow a violation to continue or grant a variance.

The Review may be requested by writing to the Director of Code Compliance, in care of Inspector Antoine Anderson,

Seattle Department of Construction and Inspections
700 5th Avenue, Suite 2200
Seattle, WA 98104-4019

If you request a review by the Director, the request
- must be in writing,
- must be received by the Director no later than ten (10) days following service of this Notice, and
- must contain the signature, mailing address and telephone number of the person requesting the review.

The request should also include a brief statement including
- specific objections to the Notice of Violation
- how the requestor is significantly affected by, or interested in, the Review by the Director.

If more than one person is cited in the Notice, the request for Review by the Director should specify the person to be contacted about the Review.

OBTAINING PERMITS
If you are constructing, repairing, adding an addition to, or demolishing a building, or if you are changing or establishing a use, you must obtain the proper permits. You may need more than one permit. Information on permits may be obtained at the SDCI Applicant Services Center by

visiting https://www.seattle.gov/sdci/about-us/who-we-are/applicant-services-center.

**PROVIDE THIS DOCUMENT WHEN APPLYING FOR ANY PERMITS.**
Even if a permit allows a longer time frame for completion of work, the compliance date in this Notice of Violation takes precedence over the completion dates specified in any permit.

\* \* \*

If needed, Inspector Antoine Anderson will meet with you or someone representing you on the site to discuss how you will bring the property into compliance with the Land Use Code.

Once you have corrected the violation, the inspector must inspect to verify compliance. If you need more information or would like a meeting, please contact the inspector. Thank you for your attention to this matter.

/S/ *Antoine Anderson*
Antoine Anderson
Housing and Zoning Inspector
206-615-0378
Antoine.Anderson@seattle.gov

Seattle Department of Construction and Inspections
700 Fifth Ave, Suite 2200
Seattle, WA 98104-4019
(206) 684-8600
seattle.gov/sdci

IN THE DISTRICT COURT OF THE UNITED STATES IN THE FIRST DISTRICT OF KANSAS

Oliver Brown,
MRS. RICHARD LAWTON, MRS. SADIE EMANUEL,
MRS. LUCINDA TODD, MRS. IONA RICHARDSON,
MRS. LENA CARPER, MRS. SHIRLEY HODISON,
MRS. ALMA LEWIS, MRS. DARLENE BROWN, MRS.
SHIRLA FLEMING, MRS. ANDREW HENDERSON, MRS.
VIVIAN SCALES, MRS. MARGUERITE EMERSON,
AND LINDA CAROL BROWN, an infant by
OLIVER BROWN, her father and next friend,
VICTORIA JEAN LAWTON AND CAROL KAY LAWTON,
infants, by MRS. RICHARD LAWTON, their
mother and next friend,

PLAINTIFFS

CIVIL ACTION NO.
T-316

JAMES WILSON EMANUEL, an infant, by MRS.
SADIE EMANUEL, his mother and next friend,

NANCY JANE TODD, an infant, by MRS. LUCINDA
TODD, her mother and next friend,

RONALD DOUGLAS RICHARDSON, an infant, by
Mrs. Iona Richardson, his mother and next friend,

KATHERINE LOUISE CARPER, an infant, by Mrs. Lena
Carper, her mother and next friend,

CHARLES HODISON, an infant, by Mrs. Shirley
Hodison, his mother and next friend,

TERRY LEWIS, MARTHA JEAN LEWIS, ARTHUR
LEWIS and FRANCES LEWIS, infants, by Mrs. Alma
Lewis, their mother and next friend,

SANDRA DORSTELLA BROWN, an infant, by
Mrs. Darlene Brown, her mother and next
friend,

DUANE EARL FLEMING and SILAS LEMRICK
FLEMING, infants, by Mrs. Shirla Fleming,
their mother and next friend,

DONALD ANDREW HENDERSON and VICKI ANN
HENDERSON, infants, by Mrs. Andrew
Henderson, their mother and next friend,

RUTH ANN SCALES, an infant, by Mrs. Vivian
Scales, her mother and next friend,

CLAUDE ARTHUR EMERSON and GEORGE ROBERT
EMERSON, infants, by Mrs. Marguerite
Emerson, their mother and next friend,

FILED
FEB 28 1951
HARRY M. WASHINGTON, Clerk

vs

BOARD OF EDUCATION OF TOPEKA, SHAWNEE
COUNTY, KANSAS, AND KENNETH McFARLAND,
SUPERINTENDENT OF SCHOOLS OF TOPEKA,
KANSAS, and FRANK WILSON, PRINCIPAL OF
SUMNER ELEMENTARY SCHOOL

## C O M P L A I N T

1. (a) The jurisdiction of this Court is invoked under Title 28, United States Code, section 1331. This action arises under the Fourteenth Amendment of the Constitution of the United States, section 1, and the Act of May 31, 1870, Chapter 114, section 16, 16 Stat. 144 (Title 8, United States Code, section 41), as hereinafter more fully appears. The matter in controversy exceeds, exclusive of interest and costs, the sum or value of Three Thousand Dollars ($3000.00).

(b) The jurisdiction of this Court is also invoked under Title 28, United States Code, section 1343. This action is authorized by the Act of April 20, 1871, Chapter 22, section 1, 17 Stat. 13 (Title 8, United States Code, section 43), to be commenced by any citizen of the United States or other persons within the jurisdiction thereof to redress the deprivation, under color of a state law, statute, ordinance, regulation, custom or usage, or rights, privileges and immunities secured by the Fourteenth Amendment to the Constitution of the United States, section 1, and by the Act of May 31, 1870, Chapter 114, section 16, 16 Stat. 144 (Title 8, United States Code, section 41), providing for the equal rights of citizens and of all other persons within the jurisdiction of the United States, as hereinafter more fully appears.

(c) The jurisdiction of this Court is also invoked under Title 28, United States Code, section 2281. This is an action for an interlocutory injunction and a permanent injunction restraining the enforcement, operation and execution of such statutes.

2. This is a proceeding for a declaratory judgment and injunction under Title 28, United States Code, section 2201, for the purpose of determining questions in actual controversy between the parties, to wit:

(a) The question of whether the state statute, Ch 72-1724 of the General Statutes of Kansas, 1935, is unconstitutional in that it gives the defendants the power to organize and maintain separate schools for the education of white and colored children in the city of Topeka, Kansas, for the reason that said authority is an unlawful deligation of legislative power, in that said authority is unlimited and without adequate standards.

(b) The question of whether the customs and practices of the defendants operating under Ch. 72-1724 of the General Statues of Kansas, 1935, are unconstitutional in that they deny infant plaintiffs and other Negro children similarly situated, the rights and privileges of enrolling, attending, and receiving instruction in the school of the district in which they reside; while such rights and privileges are granted to white children similarly situated; where the basis of this refusal and grant is the race and color of the children, and that alone.

(c) The question of whether the denial to infant plaintiffs, solely because of race, of educational opportunities equal to those afforded white children at the Sumner school and other schools similarly situated in the city of Topeka, Kansas is in contravention of the Fourteenth Amendment to the United States Constitution as being a denial of the equal protection of the laws.

3. (a) Infant plaintiffs are citizens of the United States, the State of Kansas, and Shawnee County, the City of Topeka, Kansas. They are among those classified as Negroes. They reside in various school districts, satisfy all requirements for admission to the schools for which adult plaintiffs are taxed to support; that said infant plaintiffs have presented themselves for enrollment and registration at the proper time and place, and were denied the right to enroll in and receive instruction in the schools of their respective districts, on account of their race and color, and these alone.

Instead, they are required, solely because of race and color, to attend a "so-called" Negro school, far removed from the school in the district wherein they reside; which attendance, said

Negro children are exposed to extreme hazzards to their physical bodies. As a result thereof, they do not and cannot receive educational advantages, opportunities, and facilities equal to those furnished white children at Sumner School and other schools designated for white children.

(b) Adult plaintiffs are citizens of the United States and the State of Kansas, and residnets of and domiciled in Topeka, Shawnee County, Kansas, are taxpayers of said city, county, and state, and of the United States. They are the parents and natural guardians of infant plaintiffs named herein. By being compelled to send their children to the schools outside of, and away from, the schools in the district in which they reside, they must bear burdens and forego advantages, neither of which is suffered by parents of white children situated similarly to children of plaintiffs.

(c) Plaintiffs bring this action on their own behalf and also on behalf of all citizens similarly situated and affected, pursuant to Rule 23A of the Federal Rules of Civil Prodedure, there being common questions of law and fact affecting the rights of all Negro citizens of the United States similarly situated who reside in cities in the State of Kansas in which separate public schools are maintained for white and Negro chilren of public school age, and who are so numerous as to make it impracticable to bring them all before the Court.

4. The State of Kansas has declared public education a state function in the Constitution of the State of Kansas, Article 6, sections 1 and 2. Pursuant to this mandate, the Legislature of Kansas has established a system of free public schools in the State of Kansas, according to a plan set out in Chapter 72 of the General Statutes of Kansas, 1935, and supplements thereto. The establishment, maintenance, and administration of the public school system of Kansas is vested in a Superintendent of Public Instruction, County Superintendent of Schools, and City School Boards. (Constitution of Kansas, Article 6, section 1)

5. The public schools of Topeka, Shawnee County, Kansas, are under the control and supervision of the defendants.

(a) Defendant, Board of education, is under a duty to enforce the school laws of the State of Kansas (General Statutes of Kansas, 1935, and supplements thereto, section 72-1809); to maintain an efficient system of public schools in Topeka, Shawnee County, Kansas; to determine the studies pursued, the methods of teaching, and to establish such schools as may be necessary to the completeness and efficiency of the school system. It is an administrative department of the State of Kansas, which discharges governmental functions pursuant to the Constitution and the laws of the State of Kansas. (Constitution of Kansas, Article 6, sections 1 and 2, General Statutes, 1935, and supplements thereto of Kansas, section 72-1601). It is declared by law to be a body corporate and is sued in its governmental capacity.

(b) Defendant Kenneth McFarland is Superintendent of Schools in Topeka, and holds office pursuant to the Constitution and the laws of the State of Kansas, as an administrative officer of the free public school system of the State of Kansas. He has immediate control of the operation of public schools in Topeka, Shawnee County, Kansas. He is sued in his official capacity.

(c) Defendant Frank Wilson, Principal of Summer School is an administrative officer of the free public school system of the City of Topeka, Shawnee County, Kansas, and holds office pursuant to the authority vested in the Board of Education, incorporated under and by virtue of the laws of the State of Kansas. He is sued in his official capacity.

6. Defendant, Board of Education of Topeka, Shawnee County, Kansas, has established and at the present time maintains in the City of Topeka, State of Kansas, elementary schools for the education of the school children of the City of Topeka. They are located within different districts of the City of Topeka, whose boundaries are designated by the defendant, Board of Education.

7. White children of elementary school age go to the school within the designated boundaries of the district in which they live.

Infant plaintiffs also live within the same boundaries of designated school districts, but they are required to leave the district and travel from one and one-half miles to two miles to a separated all-Negro school, solely because of their race and color,

and in violation of their rights under the Fourteenth Amendment to the Constitution of the United States.

8. As a result of compelling infant plaintiffs and others similarly situated to attend a separate all-Negro school, remotely located and outside of the school district where infant plaintiffs and others similarly situated resids, infant plaintiffs are not provided the educational opportunities by the defendants as provided for the white children similarly situated and is in violation of infant plaintiffs rights under the Fourteenth Amendment of the Constitution of the United States.

9. Adult Plaintiffs are required to send their children outside the school district in which they reside to a separate all-Negro school, whereas parents of white children are permitted to send their children to schools close at hand within the district in which they live, solely because of race and color. Thus, adult plaintiffs are being denied the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States.

10. Infant Plaintiffs and adult plaintiffs are thereby being willfully and unlawfully discriminated against by the defendants on account of their race and color, in that infant plaintiffs are compelled to attend schools outside the school district in which they live, while white children similarly situated are not so compelled; infant plaintiffs and adult plaintiffs are being deprived of their rights guaranteed by the Constitution and laws of the United States.

11. Plaintiffs are suffering irreparable injury and face irreparable injury in the future by reason of the acts herein complained of. They have no plain, adequate or complete remedy to redress the wrongs and illegal acts herein complained of, other than this suit for a declaration of rights and an injunction. Any other remedy to which plaintiffs might be remitted would be attended by such uncertainties and delays as to deny substantial relief; would involve a multiciplicity of suits; and would cause further irreparable injury not only to plaintiffs, but to defendants as

governmental agencies.

WHEREFORE, plaintiffs respectfully pray that:

1. The Honorable Court, upon filing of this complaint, notify the Chief Judge of this Circuit as required by 28 U. S. C. A., section 2284, so that the Chief Judge may designate two other judges to serve as members of a three-judge court as required by Title 28, U. S. C. A., section 2281, to hear and determine this action.

2. The Honorable Court enter a judgment or decree declaring that the General Statues of Kansas, 1935, 72-1724, is unconstitutional insofar as it empowers defendants to set up separate schools for Negro and white school children.

3. The Honorable Court enter a judgment or decree delaring that the policy, custom, usuage and practice of defendants in operation under Ch. 72-1724, General Statutes of Kansas, 1935, in denying plaintiffs and other Negro children similarly situated in the school districts of the City of Topeka, Kansas, solely because of race or color, the right and privilege of enrolling in, attending and receiving instruction in the various school districts as is provided for white children of like qualifications, are denials of their rights under the equal protection clause of the United States Constitution and are therefore unconstitutional and void.

4. The Honorable Court issue a permanent injunction forever restraining and enjoining the defendants from executing so much of Ch. 72-1724, General Statutes of Kansas, 1935, as empowers them to set up separate schools for Negro and white school children.

5. The Honorable Court issue a permanent injunction forever restraining the defendants from denying the Negro school children of the City of Topeka, Kansas, on account of their race or color, the right and priviledge of attending the schools within their respective districts, and from making any distinction based on race or color, in the opportunities which the defendants provided for public education.

6. The Honorable Court will allow plaintiffs their costs herein, reasonable fees for attorneys, and such other and further relief as may appear to the Court to be equitable and just.

7. The Honorable Court retain jurisdiction of this cause after judgment to render such relief as may become necessary in the future.

BLEDSOE, SCOTT, SCOTT, & SCOTT

By

_Chas. E. Bledsoe_
ATTORNEYS FOR PLAINTIFFS

STATE OF KANSAS )
              ) SS
COUNTY OF SHAWNEE )

CHARLES E. BLEDSOE, of lawful age, being first duly sworn on oath, deposes and says:

That he is one of the attorneys for the plaintiffs in the above and foregoing complaint. That he has read the above and foregoing statements, and verily believes that all of the statements and allegations therein are true.

_Chas. E. Bledsoe_

SUBSCRIBED AND SWORN TO BEFORE ME THIS 26 DAY OF February, A.D., 1951.

_Josephine M. Nesbitt_
NOTARY PUBLIC

My Commission Expires: Sept. 8, 1954